Kennedy, et al. v. Gardner, et al.    CV-98-608-M    09/30/99  P

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Richard E. Kennedy,
Eric Carlson, and
Lander Associates, Inc.,
     Plaintiffs

     v.                                    Civil No. 98-608-M

William M. Gardner, New Hampshire
Secretary of State; Philip T, McLaughlin,
New Hampshire Attorney General; and
Governor Jeanne Shaheen,
     Defendants


**O R D E R**


     Plaintiffs, Richard Kennedy and two potential contributors to his political campaign, bring this action pursuant to 42 U.S.C. § 1983, seeking declaratory and injunctive relief.  They claim that two separate campaign financing restrictions created by New Hampshire Revised Statutes Annotated ("RSA") 664:4 violate the First Amendment and are, therefore, unconstitutional. Specifically, plaintiffs challenge the provisions of New Hampshire's campaign finance law that: (1) prohibit all political contributions by (or on behalf of) corporations; and (2) limit political contributions from individuals and political committees to $1,000, unless a candidate agrees to limit his or her campaign expenditures in accordance with RSA 664:5-b, in which case such contributions are permitted up to $5,000.

**Standard of Review**

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

The parties agree that there are no genuine issues of material fact and their dispute - the constitutionality of the challenged statutory provisions - may be resolved as a matter of law.

**Background**

A.    Historical Facts.

Kennedy, a citizen of New Hampshire, successfully campaigned for election to the New Hampshire legislature in 1998.  He did not agree to limit his campaign expenditures or those expenditures made on his behalf.  Consequently, individuals and political committees wishing to contribute to Kennedy's campaign

were prohibited by statute from giving more than $1,000. However, other candidates, those who agreed to limit their overall campaign expenditures in accordance with RSA 664:5-a, were permitted by law to accept up to $5,000 from each individual or political committee wanting to make a contribution.

During the course of Kennedy's campaign, plaintiff Eric Carlson attempted to contribute $1,500. Realizing that such a contribution would violate the $1,000 limit imposed by RSA 664:4 V, Kennedy placed Carlson's contribution into an escrow account and did not spend those funds during his campaign.

New Hampshire's campaign finance law also provides that corporations shall not make any campaign contributions to candidates, political committees, or political parties. See RSA 664:4 I. Consequently, when plaintiff Lander Associates attempted to contribute $250 to Kennedy's campaign, Kennedy realized that the contribution violated New Hampshire's campaign finance law. As he had with the contribution made by Carlson, Kennedy placed those funds into escrow and did not use them during his campaign.

3

B.    The Challenged Statutory Provision.

Plaintiffs claim that the provisions of New Hampshire's campaign finance law imposing a $1,000 limit on individual contributions to candidates who have refused to voluntarily limit their overall campaign expenditures, while permitting individual contributions of up to $5,000 to candidates who agree to such spending limits, "unduly burdens and penalizes those candidates who refuse to sacrifice their First Amendment right to unfettered campaign expenditures."  Plaintiffs' memorandum (document no. 9) at 6.  Plaintiffs also challenge those provisions of New Hampshire's campaign finance law that preclude corporations from contributing to candidates, political committees, and political parties.

The challenged aspects of the statute provide as follows:

**Prohibited Political Contributions.**  No contribution, whether tangible or intangible, shall be made to a candidate, a political committee, or political party, or in behalf of a candidate or political committee or political party, directly or indirectly, for the purpose of promoting the success or defeat of any candidate or political party at any state primary or general election:

I.    By any corporation, or by any officer, director, executive, agent or employee acting in

4

behalf of such corporation, <u>or by any organization</u> representing or <u>affiliated with one or more corporations</u> or by any officer, director, executive, agent or employee acting in behalf of such organization.

* * *

V.  <u>By any person</u> (1) <u>if in excess of $5,000</u> in value, except for contributions made by a candidate in behalf of his own candidacy, <u>or if in excess of $1,000</u> in value by any person or by any political committee <u>to a candidate</u> or a political committee working on behalf of a candidate <u>who does not voluntarily agree to limit his campaign expenditures</u> and those expenditures made on his behalf as provided in RSA 664:5-a . . . ..

RSA 664:4 I and V (emphasis supplied).

As to the statute's apparent ban on all corporate political contributions, plaintiffs say it unconstitutionally restricts their freedom of speech guaranteed by the First Amendment. Similarly, insofar as New Hampshire's statutory scheme creates a so-called "cap gap" between maximum individual contributions that can be made to candidates who agree to limit their campaign spending (i.e., a $5,000 cap on contributions) and those which can be made to candidates who have not agreed to such spending limits (i.e., a $1000 cap), plaintiffs claim that it too

5

impermissibly restricts their protected "political speech," in violation of the First Amendment.

**Discussion**

A.   <u>Limitations of Corporate Political Contributions</u>.

Notwithstanding the seemingly unambiguous ban on all corporate political contributions imposed by RSA 664:4 I, defendants claim that the statute "has not been interpreted or enforced by the defendants as prohibiting corporations from establishing segregated funds to make political contributions and, in fact, the defendants do not prohibit such contributions." Defendants' memorandum at 10.  To support their largely undeveloped argument, defendants ambiguously point to RSA 664:3, which governs the registration of "political committees."  By citing that statute, defendants seem to implicitly suggest that corporations may make contributions to political candidates, political committees, and political parties provided they establish (or are themselves) registered "political committees." That argument, however, is flawed.

6

Not only does RSA 664:4 I expressly prohibit corporations from making any contributions to political candidates, it also prohibits them from contributing, either directly or indirectly, to political committees. So, while plaintiff Lander Associates could, conceivably, have created and then registered a political committee in the State of New Hampshire, it could not thereafter contribute to that committee. See RSA 664:4 ("No contribution . . . shall be made to a candidate, a <u>political committee</u>, or political party . . . <u>by any corporation</u>.") (emphasis supplied). Thus, notwithstanding defendants' implicit argument to the contrary, there is no lawful means by which Lander Associates could make any political contributions to candidates, political parties, or political committees in New Hampshire.[1]

---

[1]    Of course, one might argue that Lander Associates could simply comply with the provisions of RSA 664:3, register itself as a political committee, pay the requisite fees, and make the requisite filings and disclosures concerning its officers. However, defendants have not advanced that argument and, therefore, they have not provided any justification for the imposition of such impairments upon the First Amendment rights of corporate entities such as Lander Associates (i.e., some evidence that the statute is "narrowly tailored" to advance a "compelling state interest").

Suffice it to say that defendants do not proffer such a strained construction and for good reason. That reading is inconsistent with the plain import and unambiguous language of RSA 664:4 I: no corporation shall, either directly or indirectly,

7

In an effort to save the challenged aspects of RSA 664:4 I, defendants argue that, notwithstanding the unambiguous statutory language to the contrary, New Hampshire's campaign finance law does not prohibit corporations from making political contributions, provided they are made from "segregated accounts" rather than from general operating accounts.  Plainly, defendants hope to draw the challenged statutory provisions within the ambit of holdings in cases such as Federal Election Com'n. v. Mass. Citizens for Life, Inc., 479 U.S. 238 (1986) and Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990), in which the Supreme Court upheld the validity of state statutes requiring that all corporate political contributions come from segregated accounts.  In this case, however, the plain language of RSA 664:4 I does not lend itself to defendants' reading.  In fact, defendants have failed to point to any provision of New Hampshire's campaign finance law that speaks to a corporation's ability to make political contributions from so-called segregated accounts.  Thus, unlike the Michigan statute at issue in Austin, RSA 644:4 I does not "exempt[] from [its] general prohibition

_____

contribute to a candidate or political committee.

8

against corporate political spending any expenditure made from a segregated fund." Austin, 494 U.S. at 655.[2]

Consequently, the question becomes whether an outright statutory ban on political contributions by corporate entities (other than registered "political committees") can withstand constitutional scrutiny. And, in light of existing Supreme Court precedent, the court is constrained to conclude that RSA 664:4 I exceeds constitutionally permissible bounds. As the Supreme Court observed in Austin:

---

[2] The only reference the court has found in the record to so-called "segregated funds" appears on registration papers filed with the Secretary of State by The Limited, Inc. Political Action Committee, Inc. In its registration papers, that political committee represented that it would "serve as a separate segregated fund for certain employees of The Limited, Inc." See Exhibit 3 to plaintiffs' memorandum (document no. 10). Based upon those papers, it would appear that The Limited, Inc. has formed a distinct corporate entity to serve as a political committee in the State of New Hampshire. How, or even whether, defendants permit The Limited, Inc. to contribute to that political committee is unclear, particularly in light of the express prohibition against corporate contributions to political committees set forth in RSA 664:4 I. Of course, the fact that defendants may not be enforcing, or selectively enforcing, the statute as written in no way undermines plaintiffs' constitutional challenge to that statute. See, e.g., N.H. Right to Life Political Action Com. v. Gardner, 99 F.3d 8 (1st Cir. 1996).

> [T]he use of funds to support a political candidate is "speech"; independent campaign expenditures constitute political expression at the core of our electoral process and of the First Amendment freedoms. The mere fact that the [plaintiff] is a corporation does not remove its speech from the ambit of the First Amendment.

Austin, 494 U.S. at 657 (citations and internal quotation marks omitted).

So, to survive plaintiffs' constitutional challenge, the statutory ban on corporate contributions imposed by RSA 664:4 I must advance a compelling state interest. See FEC v. Mass. Citizens for Life, Inc., 479 U.S. 238, 256 (1986); Buckley v. Valeo, 424 U.S. 1, 44-45 (1976) (per curiam). Defendants have failed to identify any compelling state interest. They have merely directed the court to the New Hampshire Legislature's Declaration of Purpose relative to the campaign finance law, which provides, in pertinent part:

> The state has a compelling interest in encouraging potential candidates to run for office and in having those races be competitive to ensure greater and more effective representation of the people of the state of New Hampshire. Reasonable political campaign budgets allow a candidate to spend thousands of hours meeting with individuals rather than thousands of hours meeting the ever increasing demand for campaign funding.

10

\* \* \*

> Unimpeded access to the ballot is crucial to the
> realization of the constitutional guarantee of a
> representative form of government.  The philosophical
> basis for democracy is the equal opportunity to
> participate.  Greater participation increases effective
> representation, preserving the political power
> guaranteed to the people by the constitution.
> Expenditure limitations will allow greater ballot
> access, freer competition of ideas through individual
> speech and interaction, and more competitive campaigns.

N.H. Laws, Chapter 212 (SB 178), section 212:1 (Exhibit 1 to defendants' memorandum).  While the New Hampshire legislature has certainly identified significant state interests and values relating to the electoral process, defendants have failed to link the advancement of those goals to the State's outright ban on corporate political speech in the form of campaign contributions. For example, defendants have failed to allege (much less demonstrate) that the State's interests identified by the legislature could not be met by imposing on corporations reasonable contribution limitations (as is done with individuals), rather than an outright ban.  See, e.g., Federal Election Comm'n v. Mass. Citizens for Life, Inc., 479 U.S. 238, 265 (1986) ("Where at all possible, government must curtail speech only to the degree necessary to meet the particular

problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation.").

To be sure, states may constitutionally impose reasonable and measured limitations upon the source and amount of political contributions made by corporations. See, e.g., Austin, 494 U.S. at 659-60; Mass. Citizens for Life, 479 U.S. at 257-58. However, those limitations must be justified by, and narrowly tailored to advance, a compelling state interest. Defendants have failed to demonstrate that the complete ban on corporate political contributions imposed by RSA 664:4 I meets that demanding test, nor is it likely that they ever could. Accordingly, RSA 664:4 I, like its statutory counterpart, RSA 664:5 V (limiting independent political expenditures by political committees to $1,000), fails to survive constitutional scrutiny. See N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 19 (1st Cir. 1996) (concluding that the $1,000 limit imposed on independent expenditures by political committees by RSA 664:5 V "severely restricts political speech" and holding that "the First Amendment does not tolerate such drastic limitations of protected political advocacy."). Cf. Citizens Against Rent Control v. Berkeley, 454

U.S. 290, 297 (1981) ("In <u>First National Bank of Boston v.</u>
<u>Bellotti</u>, 435 U.S. 765 (1978), we held that a state could not
prohibit corporations any more than it could preclude individuals
from making contributions or expenditures advocating views on
ballot measures.").

B.    <u>The Constitutionality of the So-Called "Cap Gap"</u>

RSA 664:4 V creates an incentive for candidates to
participate in New Hampshire's voluntary campaign expenditure
limits program.  If a candidate pledges to adhere to set limits,
the statutory cap on individual contributions to his or her
campaign is raised from $1,000 to $5,000.  If a candidate elects
not to be bound by the expenditure limits, individual
contributions to his or her campaign cannot, by statute, exceed
$1,000 - a campaign contribution cap previously upheld by the
Supreme Court.  <u>See</u> <u>Buckley v. Valeo</u>, 424 U.S. at 29.[3]

_____

[3]    The Supreme Court recently granted a petition for
certiorari in <u>Shrink Missouri Government PAC v. Adams</u>, 161 F.3d
519 (8th Cir. 1998).  In that case, the Eighth Circuit concluded
that, "After inflation, limits of $1,075 [to candidates for
governor] . . . cannot compare with the $1,000 limit approved in
<u>Buckley</u> twenty-two years ago. . . .  In today's dollars, the
[challenged statute] appear[s] likely to have a severe impact on
political dialogue by preventing many candidates for public
office from amassing the resources necessary for effective

13

Plaintiffs' thrust is that the so-called statutory "cap gap" unduly burdens and penalizes those candidates who refuse to voluntarily limit their campaign spending. In support of their position, plaintiffs rely, at least in part, on this court's recent decision in Kennedy v. Gardner, No. 96-574-B (D.N.H. June 5, 1998) (Barbadoro, C.J.) ("Kennedy I"). In Kennedy I, plaintiff challenged those aspects of RSA ch. 655 which provided that a candidate for state or federal office who was unwilling to adhere to the State's voluntary campaign expenditure limits must file a specified number of primary petitions and pay a filing fee when declaring his or her candidacy. Candidates who agreed to limit their campaign expenditures, however, were not so burdened. The court concluded that the added burdens imposed on candidates who chose not to adhere to the campaign expenditure limits were impermissibly coercive and insufficiently related to the goal

---

advocacy." Id., at 522-23 (citations and internal quotation marks omitted). While predicting Supreme Court decisions is more a conjurer's art than a science, still, it is conceivable, that the Supreme Court may revisit the constitutionality of the $1,000 cap on contributions to candidates for public office. As the law currently stands, however, such caps are, generally speaking, permissible. And, plaintiffs do not challenge the $1,000 limit as unconstitutional by reason of economic erosion or the effects of inflation.

14

sought to be achieved by the statutory scheme - encouraging candidates to agree to limit campaign expenditures.

> [The challenged statutory provisions here] differ from the statutory schemes at issue in <u>Buckley</u> and <u>Vote Choice</u> both because the state has chosen a coercive means to achieve adherence to its spending cap and because the condition those laws impose on gaining access to the ballot – limiting the constitutional right to make campaign expenditures – bears no reasonable relationship to any legitimate reason for controlling ballot access.
>
> Rather than choosing to encourage compliance with a spending cap by providing incentives such as public financing or free television time, New Hampshire has opted to penalize non-complying candidates by making it more difficult for them to gain access to the ballot.

<u>Kennedy I</u>, slip op. at 10-11.

In this case, however, the challenged provisions of New Hampshire's campaign finance laws are more like those at issue in <u>Vote Choice</u>. Here, the State has chosen to furnish candidates with an incentive to limit their campaign expenditures, rather than impose added burdens on those who will not: those who agree, are permitted to accept contributions of up to $5,000 from individual contributors. If candidates elect not to voluntarily limit their expenditures, they remain subject to a

15

constitutionally permissible $1,000 cap on individual contributions.

Plaintiffs do not challenge the constitutionality of the $1,000 cap on individual contributions to candidates who elect not to limit their campaign expenditures.  Instead, they argue that by <u>relaxing</u> that cap by a factor of five for those candidates who agree to limit total campaign expenditures, the statutory scheme unconstitutionally <u>penalizes</u> those who refuse to compromise their First Amendment right to spend as much as they see fit on their campaign.  As the Court of Appeals observed, however, such an argument, at least in the context of this case, is largely semantic.  Whether one views the relaxed $5,000 cap as a "benefit" to participating candidates or as a "penalty" to those who elect not to participate depends largely upon one's vantage point.

> [Plaintiff] attempts to distinguish the public financing cases on the ground that they involve the propriety of conferring benefits in contrast to imposing penalties.  She is fishing in an empty pond.  For one thing, the distinction that [plaintiff] struggles to draw between denying the carrot and striking with the stick is, in many contexts, more semantic than substantive.  This case illustrates the point.  The question whether Rhode Island's system of

> public financing imposes a penalty on non-complying candidates or, instead, confers a benefit on those who do comply is a non-issue, roughly comparable to bickering over whether a glass is half full or half empty. After all, there is nothing inherently penal about a $1,000 contribution cap.

Vote Choice, 4 F.3d at 38. In the end, the court reasoned that Rhode Island's relaxed contribution cap for complying candidates was more correctly viewed as a "premium" earned by candidates who voluntarily limited campaign expenditures, rather than a penalty imposed upon those who did not.

Thus, unlike Kennedy I, which involved statutory provisions that imposed additional burdens upon candidates who chose not to limit their campaign expenditures, the statutory scheme at issue in Vote Choice merely conferred benefits on those candidates who agreed to voluntarily limit the exercise of their First Amendment freedoms. So it is in this case. The only "burden" imposed upon candidates who elect not to limit campaign expenditures is the $1,000 cap on individual contributions. That cap is plainly constitutional under existing Supreme Court precedent (and plaintiffs do not argue otherwise).

17

The challenged statutory provisions simply offer to candidates who voluntarily agree to limit campaign expenditures the benefit of a relaxed cap on individual contributions. That benefit is the quid pro quo for accepting the potential electoral disadvantages of restricted spending. And, when benefit and burden are considered together, the choice offered is not so disproportionate or one-sided as to amount to an unconstitutionally coercive "stick," in effect compelling candidates to "voluntarily" agree to spending limits and, in the process, relinquish their First Amendment rights. The choice is a fair one - an easier time raising funds but a fixed spending limit, on the one hand, or a more difficult time raising funds but unlimited ability to spend, on the other.

Plaintiffs have failed to demonstrate that the $4,000 "cap gap, standing alone, unconstitutionally infringes upon their First Amendment rights. As noted by the court of appeals for this circuit:

> [W]e have difficulty believing that a statutory framework which merely presents candidates with a voluntary alternative to an otherwise applicable, assuredly constitutional, financing option imposes any burden on First Amendment rights. In choosing between

18

> the [campaign finance options created by the statute] a
> candidate will presumably select the option which
> enhances his or her powers of communication and
> association.  Thus, it seems likely that the challenged
> statute furthers, rather than smothers, First Amendment
> values.

Vote Choice, 4 F.3d at 39.  See also Rosenstiel v. Rodriquez, 101
F.3d 1544, 1552 (8th Cir. 1996) ("This [statutory] scheme
presents candidates with an additional, optional campaign funding
choice, the participation in which is voluntary.  Under this
choice-increasing framework, candidates will presumably select
the option that they feel is most advantageous to their
candidacy.  Given this backdrop, it appears to us that the
State's scheme promotes, rather than detracts from, cherished
First Amendment values."), cert. denied, 520 U.S. 1229 (1997).

Plaintiffs also invoke the decision in Wilkinson v. Jones,
876 F.Supp. 916 (W.D. Ky. 1995), as support for the proposition
that a 5 to 1 differential in spending caps is inherently
unconstitutional.  That reliance is, however, misplaced.  The
Wilkinson court considered a statutory scheme that imposed $500
and $100 contribution caps, respectively, on candidates.  Despite
the superficial similarity of the "cap gap" ratios in this case

19

and <u>Wilkinson</u> (i.e., 5:1), there are substantive differences between the statute at issue here and the Kentucky statute addressed in <u>Wilkinson</u>. The most notable distinction is that the Kentucky statute established a base-line cap at only $100. Addressing the constitutionality of that cap, the <u>Wilkinson</u> court concluded that it (unlike the $1,000 cap sanctioned in <u>Buckley</u> and at issue in this case) was so low as to "constitute a penalty" imposed upon candidates who elected not to participate in the state's publically financed campaign program. <u>Wilkinson</u>, 876 F.Supp. at 929. Accordingly, the court properly concluded that the statute amounted to an unconstitutional infringement upon the plaintiffs' First Amendment rights. In this case, however, the $1,000 cap imposed upon individual contributions is not so low as to constitute an unconstitutional penalty, nor do plaintiffs even claim that it is.

Next, the <u>Wilkinson</u> court noted that while the disparity between contributions to participating and non-participating candidates appeared to be 5 to 1, it was more correctly viewed as being 15 to 1: "In actual application, the impact of the disparity is 15 to 1 since the publicly-financed candidate

20

receives two publicly-funded dollars for each dollar he or she raises." Wilkinson, 876 F.Supp. at 929. Thus, the court's conclusion that the "incentive, or 'carrot,' offered to publicly-financed candidates in this instance is, in practical application, a 'stick' used upon privately-financed candidates," is not one readily transferrable to the claims raised by plaintiffs here. In short, Wilkinson does not stand for the proposition that a 5 to 1 disparity in maximum allowable individual campaign contributions is an unconstitutionally coercive means by which to induce candidates to voluntarily comply with campaign spending limits.

Here, RSA 664:4 V does not impermissibly coerce or penalize candidates. And, as in Vote Choice, the court concludes that the challenged statutory scheme does not unconstitutionally burden plaintiffs' First Amendment rights. Instead, it "achieves a rough proportionality" between the advantages available to complying candidates (i.e., increased contribution cap) and the disadvantages such candidates must accept (i.e., fixed spending limits). "Put another way, the state exacts a fair price from complying candidates in exchange for receipt of the challenged

21

benefit" and "neither penalizes certain classes of office-seekers nor coerces candidates into surrendering their First Amendment rights." Id.[4]

Given the foregoing, the court concludes that the so-called "cap gap" created by RSA 664:4 V does not impermissibly burden

---

[4] To be sure, the statutory scheme at issue in Vote Choice differs significantly from that involved in this case. There, candidates who voluntarily elected to limit campaign spending also agreed to other restrictions upon their First Amendment rights, including a pledge to limit the amounts which they would raise during their campaigns. In exchange for the relinquishment of those substantial rights, the State of Rhode Island offered a correspondingly substantial package of benefits (e.g., a higher cap on individual contributions, free television access, and matching funds up to $75,000). New Hampshire's statutory scheme exacts fewer concessions from candidates who agree to adhere to campaign spending limits: they relinquish only their right to spend unlimited amounts on their campaigns (so, for example, it does not appear that they must agree to limit the total amount of money that they might raise in connection with their campaigns). Accordingly, the State has offered those candidates comparatively fewer benefits than those offered under the Rhode Island statute: candidates participating in the spending cap program receive only the ability to raise more money (i.e., $5,000) from individual contributors. Despite the differences in these statutory schemes, however, they share a fundamental similarity: the package of benefits offered to participating candidates is of roughly comparable value to the disadvantages they accept. This rough proportionality between what is given up and what is received necessarily means that candidates who elect to participate in the State's voluntary spending cap program receive no qualitative advantage over those who choose not to participate.

22

plaintiffs' exercise of political speech and survives constitutional scrutiny.

## Conclusion

New Hampshire's campaign finance law does not permit corporations (other than those specifically registered with the Secretary of State as "political committees" and subject to the restrictions imposed upon political committees) to contribute to candidates for public office, political parties, or political committees. While there may, arguably, be unmarked statutory paths on which a corporation might successfully navigate around the law's outright ban on corporate donations to political candidates and political committees, even defendants appear hesitant (or unable) to describe in any detail the route interested corporations should follow to avoid prosecution under the statute. The unambiguous ban on corporate political contributions imposed by RSA 664:4 I presents a very real imposition on corporate political contributions and corporate rights to free speech guaranteed by the First Amendment.

23

Defendants' implicit and undeveloped suggestion that corporations can creatively avoid prosecution for violations of Chapter 664: (1) because there are means by which they might circumvent the unambiguous ban on corporate political contributions imposed by RSA 664:4 I; or (2) because the Attorney General chooses not to enforce the statute as written, does little to either undermine plaintiffs' standing to challenge RSA 664:4 I or save that statute from its fatal constitutional defect. See generally N.H. Right to Life, 99 F.3d at 15 ("the danger of this statute is, in large measure, one of self-censorship . . . a harm that can be realized even without an actual prosecution.") (citations and internal quotation marks omitted). The absolute ban on corporate political speech established by RSA 664:4 I is unconstitutional.

The statutory provisions which create the so-called "cap gap" between candidates who agree to campaign spending limits and those who do not, however, survive plaintiffs' constitutional challenge. The State of New Hampshire has a legitimate interest in encouraging candidates for public office to limit the amounts spent on campaigns. The statutory scheme enacted to promote that

24

goal, at least insofar as it creates a "cap gap" between participating and non-participating candidates, does not unconstitutionally restrict First Amendment rights.

For the foregoing reasons, defendants' motion to dismiss (document no. 4) is denied. Plaintiffs' motion for summary judgment (document no. 9) is granted in part and denied in part. The ban on all corporate political contributions imposed by RSA 664:4 I is overly restrictive and unconstitutionally infringes plaintiffs' First Amendment rights. The "cap gap" created by RSA 664:4 V, however, does not unconstitutionally burden plaintiffs' political speech and, therefore, survives their constitutional challenge. The Clerk of the Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 30, 1999

cc:  Alfred J. T. Rubega, Esq.
     William C. Knowles, Esq.
     Senior Ass't. A.G. Martin P. Honigberg